**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| **LISA GAYLE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )　　　**Civil Action No.: 2:21cv445** |
| | ) |
| **UNILEVER MANUFACTURING (US), INC.,** | )　　　**JURY TRIAL DEMANDED** |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

## COMPLAINT

**COMES NOW**, Plaintiff Lisa Gayle ("Gayle" or "Plaintiff"), by counsel, brings this action against Unilever Manufacturing (US), Inc., ("Defendant"), and in support of this Complaint hereby alleges as follows:

### SUMMARY OF THE ACTION

1.     This case arises from the Defendant's unlawful discrimination in treating Gayle less favorably based on her race.  Defendant disciplined, and ultimately terminated Gayle, a Caucasian, for shared social media content disapproving of violence and property damage as forms of protest consistent with civil society. African American employees who posted violent social media content that advocated for violence against law enforcement officers and made racially hostile comments against Gayle received no discipline and were not terminated from the Defendant's employ.

2.     Furthermore, Defendant enforced its facially neutral personnel policies in a way which resulted in disparate impact based on Gayle's race.  Employee policies of the Defendant were enforced to terminate Gayle for engaging in conduct similar in nature, and less clearly in

violation of its policy, than that of conduct engaged in by similarly situated African American employees.

## THE PARTIES

3.      Plaintiff Lisa Gayle is a natural person domiciled in the City of Suffolk in the Commonwealth of Virginia. Gayle is a Caucasian woman. She is a former employee of the Defendant. She was employed by the Defendant at its Lipton Tea manufacturing plant (the "Plant") in Suffolk, Virginia from August of 2002 until her termination on July 10, 2020. She was an employee within the meaning of the term as defined by 42 U.S.C. § 2000e(f).

4.      Defendant is a Delaware corporation that has a principal place of business located at 2900 W Truman Blvd, Jefferson City, MO 65109. Defendant is the manufacturing entity for Unilever PLC, a multinational corporation, who owns many factories, including the Plant at which Gayle was employed at 1046 W. Washington St. Suffolk, VA 23434. Defendant is an "employer" within the meaning of the term in 42 U.S.C. § 2000e(b), as it employs more than fifteen people for each working day in each of twenty or more calendar weeks in the current and preceding years.

## JURISDICTION AND VENUE

5.      This suit is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

6.      This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331, as this case involves a question of federal law. Moreover, this Court has jurisdiction over the subject matter of this Complaint by operation of 28 U.S.C. § 1332 as there is complete diversity of the parties and the amount in controversy exceeds $75,000. Furthermore, this Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. §

1367(a) because those claims form part of the same case or controversy. Furthermore, Plaintiff's state law claims share a common nucleus of operative facts with the federal law claims, and the parties are identical. Resolving Plaintiff's federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

7.    Venue is proper in, and Defendant is subject to the personal jurisdiction of, this Court because Defendant maintain facilities and business operations in this Judicial District, and all or most of the events giving rise to this action occurred in this Judicial District. 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3); *see also* E.D. Va. Local Civil R. 3(B)(3).

## FACTUAL ALLEGATIONS

8.    Lisa Gayle is a Caucasian woman employed by the Defendant at its Plant in Suffolk, Virginia for nearly 18 years. She began working for the Defendant as a Machine Operator in August of 2002. Her most recent position was as a General Laborer. Gayle has an exceptional record of service and outstanding work performance while employed by the Defendant. She has never, prior to this incident, been disciplined by the Defendant for any violations of workplace rules and/or policies.

9.    In early 2020, due to medical concerns from previous surgeries, Gayle took approved medical leave from work. During her medical leave, she shared posts on the social networking platform Facebook. These posts were publicly accessible and by sharing the posts, Gayle expressed her condemnation of violent riots that took place in the streets of metropolitan centers during the Spring and Summer of 2020. Gayle, additionally, shared posts that disapprove of those who would use violence against law enforcement as a method of protest. Furthermore, Gayle shared posts that included satirical images about the media's bias in reporting on these violent riots.  A few examples of Gayle's shared posts are produced below:

3





10.     In response, several African American co-workers of Gayle commented on Gayle's posts. These employees alleged and implied that Gayle was a racist and that Gayle's posts carried racial bias and animus, despite the fact that the specific post in question contained a direct quote from a popular African American political commentator, Candace Owens. Furthermore, as a response to their own racial animus against Gayle as a Caucasian, these co-workers targeted Gayle and reported her to the Defendant. This post with the comments is produced below:



11.     Shortly after these comments, upon information and belief, co-workers of Gayle reported Gayle's posts to the Defendant's human resources department ("H.R. department") alleging that Gayle is a racist. At no time did Gayle share content directed at particular groups or individuals on the basis of race but, instead, all posts were political commentaries on matters of public concern. Furthermore, these Facebook posts were not original content from Gayle but were shared posts from other content originators and even included a direct quote from an African American political commentator.

12.     Within a week or two of sharing these posts in late June of 2020, members of the Defendant's H.R. department contacted Gayle and inquired about the nature of said posts. Katie Kolakowski ("Kolakowski"), the Plant's H.R. manager, contacted Gayle and ordered her to have a conversation about the posts with a member of Unilever's national H.R department.

13.     Upon command of Kolakowski, Gayle had multiple conversations with this representative from Unilever's corporate office, Ana Taira ("Taira"). During these conversations, Gayle was accosted by Taira with hostile accusations that Gayle was a racist and intended to willfully and maliciously post targeted negative content against African Americans. Taira repeatedly informed Gayle that Taira was biracial in unsuccessful attempts to solicit representations of personal animus from Gayle. Taira was aware at all times that Gayle was a Caucasian woman.

14.     Taira repeatedly attempted to twist Gayle's words and message with unsubstantiated and objectively false accusations of racism.  Gayle calmly attempted to explain that the content of these shared posts represented her political viewpoint against unlawful rioting and commendation of any violence toward law enforcement officers.  Gayle repeatedly explained that her posts were in no way motivated by racial animus, nor did Gayle believe that

an objective reasonable construction of her posts' content supported such a conclusion. Regardless of this explanation, Taira continued her hostile behavior against Gayle and ordered Gayle to delete the content from her Facebook. Gayle complied with the command at the continued behest and command of the Defendant's agents.

15.     Upon information and belief, Taira instructed Kolakowski and the Suffolk Factory Director, Katie Ingersoll ("Ingersoll") to start proceedings to terminate Gayle based in part on Taira's own racial animus against Gayle as a Caucasian. As a direct and proximate result of Taira's racially biased viewpoint and communications to Ingersoll and Kolakowski, Kolakowski ordered Gayle to have continued conversations with Taira where Gayle was continually accosted and ridiculed on account of her social media content and her race.

16.     On July 10, 2020, a follow-up phone conversation took place between Gayle and a team of the Plant's supervisors from various departments including but not limited to Ingersoll and Jacob Cohen ("Cohen"). During this telephone conference, Ingersoll and Cohen informed Gayle that she was being terminated from employment with the Defendant despite Gayle having explained in detail her objections to Taira's characterizations and confirmation of her compliance with Defendant's directive to delete her posts. Defendant claimed that the basis of Gayle's termination was that her shared posts violated the workplace conduct policy and a workplace social media policy. This vague conduct policy entitled "Respect, Dignity & Fair Treatment" ("Policy") states that workers must not:

> Engage in any direct behavior that is offensive, intimidating, malicious, or insulting. This includes any form of sexual or other harassment or bullying whether individual or collective and whether motivated by race, age, role, gender, gender identity, color, religion, country of origin, sexual orientation, marital status, dependents, disability, social class, or political views . . .

> [and/or]

> Engage in any indirect behaviour which could be construed as sexual or other harassment or bullying, such as making offensive or sexually explicit jokes or insults, displaying, emailing, texting, or otherwise distributing, offensive material or material of a sexually explicitly nature, misusing personal information, creating a hostile or intimidating environment, isolating or not co-operating with a colleague, or spreading malicious or insulting rumours.

Gayle has never been furnished with a copy of the referenced social media policy cited by the Defendant as a basis for her discharge.

17.     Based on the vague rules of the Policy, Defendant concluded that the mere activity of Gayle sharing social media content created a "hostile work environment" and terminated her from Defendant's employ. Specifically, Defendant further buttressed its termination decision with the subjective and pretextual allegation that Gayle's posts "created an environment where co-workers do not feel comfortable." This preceding conclusion was predicated on the underlying hostile animus toward Caucasians expressed by the employees who reported Gayle and also members of the Defendant's H.R. department, specifically Taira.

18.     Furthermore, Gayle, at all times relevant to this Complaint, was on approved medical leave and was not physically present at the workplace of the Defendant. All of Gayle's posts were shared offsite from the work environment, were not directed at specific people, and were not based on animus against certain immutable characteristics as defined by the Policy. The lack of any objective violation of the Defendant's Policy in conjunction with racially biased animus illustrates that Gayle's discharge was based on racial discriminatory practices.

19.     While Gayle was communicating with the H.R. department and was being terminated from her position, she discovered that African American co-workers and other employees of the Defendant shared and created social media posts that included egregious inflammatory and violent content that was noticeably absent from the posts shared by Gayle. Several of these posts and comments included overt or implied racial animus against Caucasians,

that included Gayle. Furthermore, independent posts by Gayle's co-workers contained unambiguous threats against specific groups such as law enforcement officers. These posts objectively violated the Policy on which the Defendant relied upon for Gayle's termination.

20.     As an example of these posts, a Facebook post by an African American co-worker S.E. on June 12, 2020,  stated "Y'all keep sleeping on these klansman . . . better use that 2nd amendment while u still can." More notably, S.E posted a meme on May 27, 2020, with the caption "When this starts to happen you'll know why." The picture showed a man firing a pistol into an New York Police Department vehicle, referring to a 2014 slaying of two police officers. The original poster, D.H, commented on May 26, 2020 "When this starts to happen Nationwide, then they wanna sit down and talk, hold meetings, try to negotiate the situation." In sharing the Facebook post, S.E's comment read "Yep." S.E also made another Facebook post on the same day calling members of law enforcement "B**ch azz gang members." One commenter said, "Shoot back," to which S.E. gave a "heart reaction", indicating full ratification and approval of the violent sentiment endorsing violence against law enforcement officers. S.E. also, on the same day, changed his Facebook profile picture to depict a person in a hood holding a handgun pointed sideways at the camera. Some of these posts are produced below:





21.    Gayle informed the Defendant through Kolakowski about the racially based comments on her content, and the violent content of her African American co-workers posts in clear and objective violation of the Defendant's Policy. Upon information and belief, the Defendant ignored Gayle's concerns and took no corrective or disciplinary actions based on Gayle's reports.

22.    All of the social media posts and comments referenced above are African American co-workers. Furthermore, upon information and belief, all of the co-workers who made posts and comments on social media are in positions with the Defendant that are similarly situated to Gayle's, are covered by the same Policy and have the same level of competency, education and requirements.  However, upon information and belief, these co-workers received no reprimand and no consequences for the posting of such violent, intimidating and insulting content.

23.    Rather than treat the situations with an equal assessment and exercise neutral policy enforcement, Defendant treated Gayle, as a Caucasian woman, with clear racial animus and disciplined her more harshly than her African American coworkers who posted social media content that came within the same Policy's scope.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

24.    After her wrongful termination, Gayle filed a charge with the Equal Employment Opportunity Commission's ("EEOC") Norfolk local office on March 5, 2021 (EEOC Charge No.: 437-2020-01481). The Commission determined on May 6, 2021, that it would not pursue Gayle's charge, but made no determination concerning the merits of her charge and did not make any findings. The Commission's decision informed Gayle of her right to bring suit within 90 days of receipt of the EEOC's decision. Furthermore, the EEOC, upon Gayle's request, provided

an Acknowledgement of Dual-Filed Charge with the Virginia Office of Civil Rights. The Virginia Office of Civil Rights deferred investigation to the EEOC and based its conclusions on the EEOC's resulting determination.

25.     Accordingly, Gayle has exhausted all available administrative remedies before filing this suit. This suit is timely as it has been filed within 90 days of receipt of the EEOC's notification of the right to sue.

**FIRST CAUSE OF ACTION**
Race-Based Discrimination (Disparate Treatment) in Violation of
Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e, *et seq.*

26.     All prior allegations set forth in this Complaint are hereby incorporated by reference.

27.     Title VII of the United State Code prohibits an employer from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010); *see* U.S.C. § 2000e-2(a)(1). This is known as disparate treatment discrimination.

28.     A plaintiff may establish liability for disparate treatment under Title VII by employing two methods of proof: (1) demonstrating through direct or circumstantial evidence that [his status-based group] was a motivating factor in the employer's adverse employment action; or (2) relying on the burden shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973).

29.     Gayle is a member of a protected class.

30.     Gayle is qualified to hold her job. During her nearly 18 years of work history for the Defendant at the Plant, Gayle received no derogatory marks and had an impeccable record of service with the Defendant.

31.     On July 10, 2020, Gayle was terminated from the company based on social media posts which the Defendant claims were in violation of its Policy. She was additionally terminated for creating "an environment where co-workers do not feel comfortable", despite not being on the jobsite when she was terminated.

32.     Upon information and belief, African American employees similarly situated to Gayle that worked in positions that have the same level of competency, education and requirements, received more favorable treatment from the Defendant, despite posting inappropriate, offensive and threating social media posts. As described above, these African American employees made offensive and derogatory Facebook comments and posts that were of a violent nature and/or contained animus toward Gayle on account of her race. Despite these co-workers making and sharing said posts, no adverse employment action was taken against those employees by the Defendant. Furthermore, African American co-workers received no adverse discipline or punishment from the Defendant for conduct that objectively violated the Defendant's Policy.

33.     Because Gayle is Caucasian and the coworkers are African American, these unequal actions by the Defendant demonstrate disparate treatment based on race. The posts shared by African American coworkers consisted of far more prejudicial and disruptive content than that posted by Gayle.  These posts by African American coworkers were objectively intimidating and created a hostile environment to those of differing viewpoints and races. Therefore, these posts by similarly situated co-workers objectively violated the Defendant's

15

Policy, an alleged violation thereof being the pretext for which Gayle was terminated. In contrast to Gayle, African American co-workers expressly advocated for violence against specific groups such as law enforcement officers. If the Defendant was not discriminating on the basis of race, it would be reflected in consistent application of its own rules of conduct across racial lines. Instead, Defendant chose to terminate a Caucasian woman, Gayle, while allowing African American coworkers to make disparaging and violent posts online without any consequences for violation of a facially neutral policy. Additionally, as evidence of the Defendant's discriminatory motive, Gayle was repeatedly accosted on account of her race by an employee of the Defendant, Taira. But for Gayle's race, she would have not been treated with such animus and hostility by the members of the Defendant's H.R. department, nor would she have been subsequently terminated.

34.     As a direct, actual and proximate result of the Defendant's racial discrimination, in violation of Title VII, Plaintiff has suffered significant pecuniary and non-pecuniary damages including loss of benefits, loss of promotion opportunities, loss of back pay, loss of future pay, mental anguish, pain, suffering, humiliation, frustration, loss of reputation and loss of quality and enjoyment of life.

**<u>SECOND CAUSE OF ACTION</u>**
Race-Based Discrimination (Disparate Impact of Employment Policy) in Violation of
Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e, *et seq.*

35.     All allegations set forth in this Complaint are hereby incorporated by reference.

36.     Title VII of the United State Code declares it unlawful for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely

affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2). This is known as disparate impact discrimination.

37.     To plead a prima facie case of disparate impact discrimination, a plaintiff must "identify the specific employment practice being challenged, and then demonstrate that the policy excluded the plaintiff, as a member of a protected group, from certain benefits of employment." *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 994 (1988).

38.     The Defendant's Policy is used to limit employee's employment rights. Specifically, the Policy is applied to employee social media posts in such a way that it creates a statistically significant disparity between Caucasians and African Americans on issues involving race. The Policy is never, or rarely, used as the basis for discipline or discharge of African American employees. Rather, the application of the Policy with regard to race is usually the basis for discipline or discharge of Caucasian employees.

39.     As a direct, actual and proximate result of the Defendant's unlawful racial based application of its Policy, in violation of Title VII, Plaintiff has suffered significant pecuniary and non-pecuniary damages including loss of benefits, loss of promotion opportunities, loss of back pay, loss of future pay, mental anguish, pain, suffering, humiliation, frustration, loss of reputation and loss of quality and enjoyment of life.

## THIRD CAUSE OF ACTION
Race-Based Discrimination in Violation of the
Virginia Human Rights Act (VA HRA), Va. Code § 2.2-3900 *et seq*.

40.     All allegations set forth in this Complaint are hereby incorporated by reference.

41.     The Virginia Human Rights Act makes it unlawful for an employer to "[f]ail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment because of such

individual's race, color, religion, sex, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions including lactation, age, military status, disability, or national origin . . . ." Va. Code § 2.2-3905.

42.     As amended in 2020, the Virginia Human Rights Act, under § 2.2-3908, creates a private cause of action for those individuals aggrieved by unlawful discrimination and entitles them to an award of compensatory and punitive damages as well as attorneys fees and injunctive relief.

43.     On July 10, 2020, the Defendant claimed Gayle was terminated from the company based on social media posts, which the Defendant alleges were in violation of its Policy. She was additionally terminated for creating "an environment where co-workers do not feel comfortable", despite not being on the jobsite when she was terminated.

44.     Upon information and belief, African American employees similarly situated to Gayle that worked in positions that required the same level of competency, education and requirements, received more favorable treatment from the Defendant despite posting inappropriate, offensive and threating social media posts that were in violation of the Policy, upon which Defendant bases the termination of Gayle. As described above, these African American employees made offensive and derogatory Facebook posts that were of a violent nature that was noticeably absent from any post shared by Gayle. Despite these co-workers making and sharing said posts, no adverse employment action was taken against those African American employees by the Defendant. Furthermore, African American co-workers who violate said Policy receive no formal discipline or punishment from the Defendant for their conduct.

45.     Because Gayle is Caucasian and the coworkers are African American, these actions by the Defendant demonstrate unlawful discrimination on the basis of race. The posts

shared by African American coworkers consisted of far more prejudicial and disruptive content than that posted by Gayle.  These posts by African American coworkers were objectively intimidating and threatening to viewers. If Defendant was not discriminating on the basis of race, it would be reflected in consistent application of its own rules of conduct across racial lines. Instead, Defendant chose to terminate a Caucasian woman, Gayle, while allowing African American coworkers to make disparaging and violent posts online without any consequences for violation of a facially neutral policy.

46.     As a direct, actual and proximate result of the Defendant's unlawful racial discrimination, in violation of Virginia Code § 2.2-3905, Plaintiff has suffered significant pecuniary and non-pecuniary damages including loss of benefits, loss of promotion opportunities, loss of back pay, loss of future pay, mental anguish, pain, suffering, humiliation, frustration, loss of reputation and loss of quality and enjoyment of life.

## PRAYER OF RELIEF

**WHEREFORE,** Defendant's termination of Gayle constituted unlawful race discrimination, in violation of Title VII of the Civil Rights Act of 1964 and the Virginia Human Rights Act, Plaintiff requests that this Honorable Court award the following relief:

A.     Grant a permanent injunction enjoining Defendant, its officers, successors, assigns and all persons in active concert or participation with it, from engaging in any unlawful employment practice that is the subject of this Complaint;

B.     Declare that Defendant's actions, policies, and practices as alleged herein are unlawful and violate 42 U.S.C. § 2000e, *et seq.* and Va. Code § 2.2-3900 *et seq.*;

C.     Order Defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities for affected employees like Gayle, and which serve to eradicate the effects of the Defendant's past unlawful employment practices;

D.     Order Defendant to make whole Gayle by providing appropriate backpay with prejudgment interest, and other affirmative and equitable relief necessary to eradicate the effects of its unlawful employment practices, including but not limited to, rightful-place reinstatement or front pay, in amounts to be determined at trial;

E.     Order Defendant to make whole Gayle by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including all expenses but not limited to job search expenses and medical expenses, in amounts to be determined at trial;

F.     Order Defendant to make whole Gayle by providing compensation for past and future non-pecuniary losses, including emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and humiliation;

G.      Order Defendant to pay Gayle punitive damages for its malicious and/or reckless conduct described above, in amounts to be determined at trial;

H.     Award Gayle all interest on lost wages, compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

I.     Order Defendant to provide training to its officers, managers and employees regarding the prevention of unlawful race-based discrimination practices in the workplace;

J.     Award Gayle her reasonable attorneys' fees, costs of suit, and expenses pursuant to 42 U.S.C. § 2000e-5(k);

K.    Grant Gayle such further relief as the Court deems necessary and proper in this

case.

<strong><u>JURY DEMAND</u></strong>

Plaintiff Lisa Gayle, hereby demands a trial by jury on all counts.

*Respectfully Submitted,*

**Dated: August 3, 2021**            **LISA GAYLE**
                                     *By Counsel*

_____/s/_____

Brandan M. Goodwin, Esquire (VSB No. 94766)
John M. Kaptan, Esquire (VSB No. 94830)
HANGER & ASSOCIATES, P.C.
618 Village Dr. Ste J,
Virginia Beach, Virginia 23454
Phone: (757) 351-1510
Fax: (757) 229-5900
Email: BGoodwin@hangerlaw.com
Email: JohnKaptan@hangerlaw.com
*Counsel for Lisa Gayle*